# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

CHARLES E. THOMPSON,        )
                                        )

           **Plaintiff,**       )

                                          )

**v.**                                     )        **Civil Action No. 7:13-CV-32**

                                          )

**CAROLYN W. COLVIN,**[1]      )
**Acting Commissioner of Social Security,**   )

                                        )

           **Defendant.**     )

## REPORT AND RECOMMENDATION

Plaintiff Charles Edward Thompson ("Thompson") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Thompson alleges that the Administrative Law Judge ("ALJ") improperly evaluated the opinion of his treating physician, erred in discrediting his testimony, and failed to adequately consider his obesity. I conclude that substantial evidence supports the ALJ's decision on all grounds. Accordingly, I **RECOMMEND DENYING** Thompson's Motion for Summary Judgment (Dkt. No. 9), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 13.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Thompson failed to demonstrate that he was

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

Case 7:13-cv-00032-MFU-RSB   Document 17   Filed 07/31/14   Page 1 of 22   Pageid#: 819

disabled under the Act.[2] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Thompson protectively filed for SSI and DIB on December 4, 2009, claiming that his disability began on August 28, 2009. R. 14, 176–81. Thompson again filed for SSI on August 30, 2010, also alleging disability starting August 28, 2009. R. 14, 182–90. The Commissioner denied the applications at the initial and reconsideration levels of administrative review. R. 76–88, 93–99. On November 29, 2011, ALJ Thomas W. Ervin held a hearing to consider Thompson's disability claim. R. 28–53. Thompson was represented by an attorney at the hearing, which included testimony from Thompson and vocational expert Mark Hileman.

On December 13, 2011, the ALJ entered his decision analyzing Thompson's claim under the familiar five-step process[3] and denying in part and granting in part his claims for benefits.

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the

2

R. 14–23. The ALJ found that Thompson suffered from severe impairments of obesity; cervical and lumbar degenerative disc disease; osteoarthritis; a history of total right hip replacement; glaucoma; hepatitis C; and diabetes mellitus. R. 16–17. The ALJ found that since August 28, 2009, these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 17–18. The ALJ further found that since August 28, 2009, Thompson had the ability to perform light work, with the following additional limitations:

> The claimant cannot climb ladders, ropes or scaffolds, and cannot work around hazards. Due to hepatitis C, he cannot handle or prepare food for consumption. Due to pain and the side effects of his medications, the claimant has impaired concentration, persistence, or pace, and is limited to simple, routine, repetitive unskilled tasks. Due to poor reading skills, the claimant is limited to jobs with reading of no more than very basic words and instructions.

R. 19.

The ALJ determined that Thompson could not perform any of his past relevant work, which required medium to heavy exertion. R. 21. The ALJ found that Thompson filed his claim as an "individual closely approaching advanced age," but that on May 14, 2011, his age category changed to an "individual of advanced age" under the regulations. R. 21. The ALJ further found that prior to May 14, 2011, the date claimant's age category changed, Thompson could work at jobs that existed in significant numbers in the national economy, such as a small products/bench assembler, laundry folder, and housekeeping cleaner. R. 21–22. After Thompson's age category changed, however, the ALJ found that there were no jobs that Thompson could perform. R. 22. Accordingly, the ALJ concluded that Thompson was not disabled prior to May 14, 2011, "but became disabled on that date and has continued to be disabled until the date of this decision."

---

claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

R. 22. Accordingly, the ALJ awarded both DIB and SSI benefits as of May 14, 2011. On November 23, 2012, the Appeals Council denied Thompson's request for review regarding the ALJ's finding that he was not disabled prior to his age category change. R. 1–5. This appeal followed, focusing on the ALJ's decision to find Thompson not disabled during the period prior to May 14, 2011.

## ANALYSIS

Thompson argues that the ALJ's decision is not supported by substantial evidence on three grounds. First, Thompson contends that the ALJ should have given controlling weight to the opinions of his treating physicians. Second, Thompson asserts that the ALJ improperly found that his testimony was not credible. Third, Thompson argues that the ALJ failed to properly consider his obesity under the regulations.

## Treating Physician

Thompson asserts that the ALJ improperly weighed the opinions of two treating physicians, Drs. David Keilman and Sergey Shvygin,[4] who suggested that Thompson was limited to work at the sedentary exertion level or less. The ALJ gave "limited weight" to the portion of Dr. Keilman's opinion that Thompson could only stand or walk for four hours in an eight-hour workday because it was "not supported by the treatment records and other objective medical evidence of record." R. 21. Similarly, the ALJ gave "no weight" to the opinion of Dr. Shvygin about Thompson's inability to perform full time competitive work on a sustained basis because "they are not supported by objective findings or the claimant's treatment history." R. 18. Thompson alleges that the ALJ's analysis was insufficient and "impermissibly relied on his lay

---

[4] Although the ALJ and Commissioner refer to Dr. Shvygin as Dr. Shrygon, the medical record reflects that Shvygin is the proper spelling. R. 659–60.

4

judgment of the records and testing to make his RFC finding." Pl.'s Br. Summ. J. 12. I disagree, and find that substantial evidence supports the ALJ's analysis of the opinion evidence.

The social security regulations require that an ALJ give the opinion of a treating physician source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

The record reflects that Thompson is obese and has a history of back pain stemming from a right hip replacement in 2006, as well as poorly-controlled diabetes that causes neuropathy in his legs. His complaints of functional loss are primarily associated with back, leg, and shoulder pain. Thompson was incarcerated from 1980 to 2002 (R. 35) and after his release worked as a dryer operator (medium exertion) and bricklayer helper in the construction industry (heavy exertion). R. 47–48. Thompson alleges that his disability began on August 28, 2009, when the construction company he worked for laid off its entire staff. R. 37, 216. At the administrative

5

hearing, Thompson testified that the business "slowed down, but they never called me back to work because they said I couldn't perform my job duties." R. 38. Thompson testified that he can't stand more than 30 minutes because of his back pain and swelling and burning sensation in his legs and feet. R. 39, 44. Thompson said that he could walk a couple of blocks without taking a break, lift or carry about 30 pounds, and sit for 15 minutes without changing positions. R. 30. Thompson stated that relieved his back pain by lying down. R. 43–44. Thompson went on unemployment following his termination, but testified that he didn't look for jobs because of his back condition. R. 38. Thompson admitted lying about any continued job search, stating that "I had to. That's the only way I could get some money." R. 38–39. Thompson apparently returned to work briefly for only two or three months at a fast food restaurant. R. 41.

The medical record shows that on December 9, 2009, Thompson saw his family doctor, David Keilman, M.D., for a check up on his diabetes and depression. R. 295. Thompson reported having high blood sugars but that physically he felt ok, and that he had neither been depressed nor had mood swings lately. Thompson told Dr. Keilman that he had been laid off of his construction job and that he was in the process of looking for another job, a statement Thompson later claimed was a lie. R. 39. Dr. Keilman noted that Thompson's weight was stable, and suggested that his diabetes required better control. Providers at Roanoke-Salem Family Medicine the next day also noted that Thompson's diabetes was poorly controlled. R. 469–70. Lab work confirmed as much (R. 293) but treatment records do not evidence any functional loss around that time.

Thompson saw Gilbert C. Rice, III, D.O., of Roanoke-Salem Family Medicine on January 14, 2010 for complaints of diabetes, high blood pressure, and right hip pain. R. 472–78. Thompson reported that the pain level in his right hip was 7/10, described the pain as intermittent

6

dull aches that were exacerbated by walking a lot. R. 473. Thompson stated that the pain started three months prior. Thompson also asked that Dr. Rice's practice and not his previous healthcare provider manage his diabetes. A physical exam was unremarkable, and Dr. Rice ordered Thompson diabetes and blood pressure medication, and suggested lifestyle modifications. R. 474–75. On January 26, 2010, Thompson reported that his blood sugars were ok, and also stated that he was on unemployment. R. 318.

After roughly three months without any office visits, Thompson sought treatment on April 22, 2010 with Roger A. Hofford, M.D., for complaints of right hip and back pain after a fall in the snow. R. 327. Thompson rated his pain in his hip and back at 5/10, and that the pain started two months ago, with intermittent duration. R. 327. On physical exam, Dr. Hofford found limited range of motion on hip flexion passively and with external rotation, but that there was no point tenderness in Thompson's back. R. 327. Dr. Hofford noted that "[i]f x-rays are clear, consider [physical therapy]." R. 328. X-rays of Thompson's lumbar spine showed prominent multilevel degenerative disc changes, advanced osteoarthritic changes, and decreased range of motion on flexion and extension. R. 337.

On May 19, 2010, Thompson reported dizziness and nausea from Tramadol, his pain medication. R. 491. Thompson was prescribed Naproxen instead. On June 15, 2010, Thompson reported a "needle-like" feeling in both of his lower legs, and that his toes went numb sometimes. R. 382. Thompson rated his lower back pain at 3/10, and that the pain got worse when he sits for a long time. The pain was alleviated by rest and lying around. Thompson did not report any other muscle or joint pain, and other than the sensation in his feet, he denied other motor or sensory problems. R. 283. Dr. Rice noted that Thompson had not instituted any particular lifestyle modifications, and that Thompson was not monitoring his blood glucose

levels as previously recommended. R. 382. Dr. Rice also indicated that Thompson's low back pain was associated with lifting. Other than tenderness in his lumbar spine, Dr. Rice's physical exam of Thompson was unremarkable. R. 383. Dr. Rice found that Thompson's hypertension was well controlled, and that Thompson's foot pain may be a result of neuropathy from poor diabetes control. R. 383–84. Dr. Rice recommended continued monitoring of blood pressure and glucose levels, as well as lifestyle changes such as a healthy diet and not to smoke. R. 501. As for Thompson's back pain, Dr. Rice noted that there were no findings of somatic dysfunction other than tenderness, and adjusted Thompson's medication. R. 384.

On July 15, 2010, Thompson saw Mary G. Sweet, M.D., for follow up. R. 344–50. Thompson reported side effects from his pain medication as well as burning lower right leg pain. R. 344. Thompson also stated that he had no weakness, but that the pain was uncontrolled and keeping him from doing manual labor. A physical examination was unremarkable, although Thompson exhibited an antalgic gait favoring his right side. R. 345. Dr. Sweet adjusted Thompson's pain medication to Neurontin. Testing from that time also confirmed that Thompson had hepatitis C (R. 352) although other studies showed that Thompson's stomach and liver did not show abnormalities. R. 519.

On July 27, 2010, Thompson reported that his back pain was rated as 12/10, and that he could hardly move. R. 393–94. Thompson also reported hand pain. Thompson stated that he was compliant with his medications, but that the Neurontin was not working, and that he couldn't work because of his back and was trying to get disability benefits. R. 394. Thompson reported that the pain was isolated to his low back at that time, with no radiation or weakness in his legs. A physical examination revealed pain and spasm in his thoracic region, and decreased range of motion, tenderness, pain, and spasm in his lumbar region. R. 395. However, Thompson had a

8

normal gait, a straight leg raise test was negative, and he exhibited normal strength and reflexes. Notes also reflect that he walked with a cane at that time. Thompson was prescribed new medication, including an anti-inflammatory and hydrocodone, and physical therapy was recommended. R. 395.

Thompson saw Maureen L. McGary, NP-C on August 24, 2010 for consultation regarding his hand and joint pain. R. 683–86. Thompson reported that he was employed as a laborer and had increasing difficulty working. R. 684. Thompson complained of peripheral neuropathy, and Neurontin helped with the neuropathy but not with his back pain. Thompson also complained of pain and swelling in his left knee and hands. On physical exam, Thompson's exhibited only trace tenderness in his spine, with normal flexion, extension, and alignment, as well as a negative straight leg raise test both sitting and laying down. R. 685. Thompson's reflexes and sensation were normal, and Thompson had full muscle strength in his deltoids, biceps, triceps, quadriceps, hamstrings, and hip flexors. Thompson had no swelling or tenderness in his shoulders, elbows wrists, fingers, feet, toes, ankles. Thompson's knees had full range of motion and no tenderness, although the right knee had moderate pain with motion and decreased flexion. X-rays of Thompson's left knee showed mild osteoarthritis. R. 459–60, 656. Ms. McGary continued Thompson on his medications, recommended physical therapy, and discussed the possibility of injections. R. 683.

On September 2, 2010, Thompson again reported lower back pain, although he indicated that his medication alleviated the pain. R. 542. Dr. Rice noted that Thompson does not regularly check his blood pressure or glucose levels. Dr. Rice's examination showed tenderness in paraspinal musculature from L1-5 bilaterally. R. 543. Dr. Rice continued Thompson's

9

medication, ordered physical therapy, and recommended increasing physical activity and to perform home exercise as tolerated. R. 543.

On October 26, 2010, Thompson saw Elizabeth Wicks, FNP, for complaints of right arm numbness and abdominal pain on his left side. R. 548. Thompson advised Ms. Weeks that the abdominal pain was not related to activity, but that he suspected it was caused by his cessation of his antidiabetic medication. Thompson admitted never checking his blood sugars, but that cost was an issue. R. 548. Ms. Weeks described Thompson's hypertension as being under fair control, and his diabetes as under bad control. R. 551. Ms. Weeks continued Thompson's medications and encouraged a healthier diet.

On November 9, 2010, Thompson saw Sergey Shvygin, M.D., for the purposes of filling out a disability forms and a DMV clearance. R. 659. Dr. Shvygin "reviewed his chart for more then [sic] 20 min." and conducted a physical examination—which was unremarkable—before filling out a multiple impairment questionnaire form. R. 659, 428–35. Dr. Shvygin noted that Thompson did not have any impairments that prevented him from driving a car. R. 659. When asked for the dates and frequency of his previous treatment of Thompson, Dr. Shvygin did not provide an answer.[5] R. 428. Dr. Shvygin diagnosed Thompson with chronic lower back pain and osteoarthritis of the hips and knees, and stated that Thompson's prognosis was poor. R. 428. However, Dr. Shvygin failed to identify any clinical findings in support of these diagnoses, and only cited a lumbar x-ray and Thompson's subjective complaints of pain as supporting evidence. R. 428–29. In a check-the-box portion of the form. Dr. Shvygin indicated that Thompson could sit for one hour, and stand for one hour or less in an eight-hour workday. R. 430. Conflictingly, Dr. Shvygin noted that it would not be necessary or recommended for Thompson not to sit

---

[5] This is presumably because no such treatment history exists, as there are no records of additional visits with Dr. Shvygin by Thompson beyond the November 9, 2010 visit to fill out disability and DMV forms. R. 659–60.

10

continuously, but that he would require frequent breaks to get up and move around. R. 420. Dr. Shvygin indicated that Thompson could occasionally lift and carry up 10 to 20 pounds, and frequently carry lesser weight amounts. R. 431. Dr. Shvygin did not find that Thompson had any manipulative limitations, was not prone to "good days" or "bad days," nor did he list any medicinal side effects from which Thompson suffered. R. 431–32. Finally, Dr. Shvygin indicated that Thompson would have additional limitations of no pushing, pulling, kneeling, bending, or stooping. R. 434.

On November 17, 2010, Thompson saw Hugh M. Gravitt, CMA, of Roanoke Rheumatology for follow up R. 655–58. Thompson complained of joint swelling, muscle tenderness, joint pain, and stiffness. However, a physical examination was largely unremarkable, with no swelling and tenderness throughout. R. 657. Thompson's right knee exhibited some pain and tenderness with motion. Mr. Gravitt discussed injections with Thompson, who did not express interest because a previous cortisone injection made his knee worse. R. 656.

Thompson reported persistent right shoulder pain and right arm numbness to Ms. Weeks on December 15, 2010. R. 558. Thompson stated that the pain started several months ago, that the pain was constant and sharp, and that the pain was exacerbated by activity. Thompson stated that at times he lost grip of objects because of the right arm numbness. Ms. Weeks suspected shoulder bursitis, although an x-ray showed no acute findings but osteoarthritis. R. 457. Thompson was referred to a gastrointestinal specialist, Marrieth Rubio, M.D., for persistent nausea. R. 636–42. Dr. Rubio's physical examination showed no abnormalities, including normal range of motion, gait, and muscle tone. R. 639. Dr. Rubio diagnosed a stomach infection and dysphagia, for which she prescribed medication and a referral for surgical consultation. R. 639.

On January 4, 2011, Thompson saw Dallas P. Crickenberger for his shoulder pain.

R. 631–33. Thompson reported that numbness extends to his right elbow, but not below that point, and occasionally had associated neck pain. R. 632. On examination the right shoulder showed external rotation of 60 degrees, internal rotation of 70 degrees, abduction of 160 degrees, and forward flexion of 170 degrees. An impingement test was positive but a drop arm test was negative. Thompson had tenderness over the bursa but good rotator cuff function. The cervical spine showed good range of motion, and that extension and leaning reproduced the right shoulder pain. R. 633. Dr. Crickenberger recommended a neurosurgery consult and placed Thompson on Voltaren. R. 633.

Thompson saw a neurosurgeon, John C. Fraser, M.D., on February 4, 2011. R. 623–24. Results of Dr. Fraser's physical examination were largely normal. Images of the cervical spine ordered by Dr. Fraser showed moderate multilevel degenerative spondylosis and a small right paracental posterior disc/osteophyte complex. R. 456, 603.

Thompson reported continued shoulder pain and numbness on February 28, 2011. R. 444. Dr. Rice noted that Thompson did not have any "red flags" for low back pain including incontinence or saddle anesthesia, and no radiation of the low back pain. R. 445. Thompson rated his pain 10/10 to one provider, and 8/10 to another provider on the same day. R. 444–45. Dr. Rice's physical examination showed no musculoskeletal abnormalities, including no tenderness or restriction in Thompson's thoracolumbar spine, and no apparent gross motor or sensory defects. R. 447. At the visit, Thompson refused to sign a controlled-substance agreement, and became irritated and left. R. 448. As a result, Thompson was dismissed from Roanoke-Salem Family Medicine. R. 442–43.

Upon dismissal from his primary care provider, Thompson returned to the care of David Keilman, M.D. R. 715. Thompson still was not monitoring his blood glucose level in March

2011. On May 11, 2011, Thompson again reported back and leg pain, but Dr. Keilman noted that "[e]xamination of the back does not show any obvious tenderness" and a straight leg raise test was negative. R. 712. Nor did Dr. Keilman observe the calf swelling of which Thompson complained. In July 2011 Thompson's back and leg complaints continued, but Dr. Keilman noted that Thompson was not in acute distress, and a straight leg raise test was negative. R. 707. Thompson declined a referral to a back specialist because of finances.

On September 30, 2011, Dr. Keilman, filled out an RFC questionnaire detailing his opinion of Thompson's functional limitations. R. 724–31. Dr. Keilman prefaced his conclusions by noting Thompson's financial and educational constraints, stating that "I believe that if he had a reliable supply of medications and regular care…that his medical condition could be significantly improved which would then have an influence on whether he is truly disabled or not." R. 276. Dr. Keilman diagnosed Thompson with diabetes mellitus, hypertension, hepatitis C, hip arthritis, and lumbar disc disease, and found that these conditions were "well established" by clinical findings. R. 724. Dr. Keilman stated that Thompson's prognosis was fair as long as he was compliant with medications. Dr. Keilman noted Thompson's low back pain and burning in his legs, and suspected that he was developing peripheral neuropathy because he did not adequately manage his diabetes. R. 725. Dr. Keilman stated that he was unable to completely relieve Thompson's pain through medication because of Thompson's inability to afford medications and take them as prescribed. R. 726. Thompson was tolerating his medications well, however. R. 728.

As to Thompson's exertional limitations, Dr. Keilman determined that Thompson could sit for four hours in an eight-hour workday, and stand for four hours in an eight-hour workday. R. 726. Dr. Keilman stated that Thompson must get up and move around every 30 minutes, and

13

that it would be 30–60 minutes before he would be able to sit again. R. 726–27. Thompson would be able to frequently lift and/or carry up to 20 pounds, occasionally lift 20–50 pounds, and never lift over 50 pounds. R. 727. Dr. Keilman noted that, because of his history of carpal tunnel syndrome, Thompson suffered from minimal-to-moderate manipulative limitations. R. 727–28. Thompson's symptoms were expected to increase upon being placed in a competitive work environment. R. 728. Dr. Keilman stated that Thompson's pain could frequently affect his attention and concentration, but these limitations would decrease with proper management. R. 729. Finally, Dr. Keilman noted that Thompson would require one or two 30-minute breaks per day, and that Thompson would have "good days" and "bad days" requiring his absence from work two or three times a month. R. 730. Dr. Keilman did not indicate any limitations in pushing, pulling, kneeling, bending, stooping, and environmental limitations. R. 730.

The ALJ's decision to accord less weight to the opinions of Drs. Keilman and Shvygin is supported by ample evidence in the record. While Thompson's diagnoses were well established, the record is largely devoid of objective evidence documenting functional loss that rendered him unable to perform light work. Despite reports of debilitating pain, physical examinations of Thompson by various providers yielded largely benign findings throughout the relevant period. Imaging studies did show degenerative changes in Thompson's spine (R. 336–37) but other than occasional trace back tenderness, treatment notes from both general practitioners and specialists routinely revealed unremarkable findings. R. 327, 345, 383, 447, 623, 639, 657, 659, 685, 707, 712. In his many office visits Thompson never had a positive straight leg raise test (R. 395, 685, 707, 709, 712) and only once had an abnormal gait. R. 345, 395, 639. Thompson's course of treatment during the relevant period was conservative, as medical providers prescribed medications and physical therapy and never recommended any kind of surgery. At one point in

14

September 2010 a doctor recommended that Thompson even *increase* his physical activity and home exercise. R. 543. Thompson's complaints about disabling shoulder, hip, and leg pain are similarly unsupported by the medical record.

With regard to Dr. Keilman's opinion, substantial evidence supports the ALJ's decision to reject Dr. Keilman's standing and walking limitation because it lacked support in the treatment record. While Dr. Keilman had a history of treating Thompson, Thompson saw Dr. Keilman only a handful of times following his alleged onset date (December 9, 2009 [R. 295], March 28, 2011 [R. 715], May 11, 2011 [R. 712], July 14, 2011 [R.707], August 30, 2011 [R. 705]). The treatment records from these visits simply do not support Dr. Keilman's restrictive limitations. On December 9, 2009, Thompson reported to Dr. Keilman when discussing his diabetes that was physically "okay." R. 295. On March 28, 2011, after not seeing Thompson for more than a year, Dr. Keilman did not perform a physical examination to confirm complaints of paresthesias. R. 715. On May 11, 2011, Dr. Keilman noted upon examination of Thompson's back that there was no obvious tenderness, a straight leg raise test was negative, and he observed no calf swelling. R. 712. On July 14, 2011, Thompson, who was in no acute distress, had a negative straight leg raise test and Dr. Keilman "really did not need to do any other exam." R, 707. Similar findings were made on August 30, 2011. R. 705. Little in this treatment history provides objective clinical support for Dr. Keilman's limitation that Thompson could only stand or walk for four hours in an eight-hour workday.

Similarly, the ALJ's analysis with respect to Dr. Shvygin was reasonable in light of the record. In his functional questionnaire, Dr. Shvygin rendered his opinion by checking boxes while providing almost no supporting explanation or elaboration for his conclusions. "Such check-the-box assessments without explanatory comments are not entitled to great weight, even

15

when completed by a treating physician." Leonard v. Astrue, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993). The form itself reflects that Thompson had no treatment history with Dr. Shvygin (R. 428) and Dr. Shvygin admittedly spent a brief period of time reviewing Thompson's treatment chart. R. 659. Dr. Shvygin cites no supporting objective clinical findings beyond an x-ray of Thompson's back. R. 428–29. Indeed, the record of Dr. Shvygin's physical examination from Thompson's November 9, 2010 office visit shows no abnormal findings. R. 659. Dr. Shvygin also found that Thompson did not have any impairments that prevented him from driving. R. 659. For these reasons in particular, the ALJ was well supported in giving no weight to Dr. Shvygin's opinion.

I note that while treatment notes document Thompson's various and sundry subjective complaints of symptoms, that medical providers have documented these complaints in their assessments or notes does not transform those complaints into objective clinical evidence. See Webb v.. Astrue, 2012 WL 3061565, at *17 (N.D.W. Va. June 21, 2012) (citing Craig v. Chater, 76 F.3d 585, 590 n. 2 (4th Cir.1996)). More fundamentally, for reasons discussed in the next section, the ALJ was entitled to find Thompson's subjective complaints not credible.

Thompson objects to the ALJ's analysis for failing to "point to any specific findings in the treatment records or specific objective findings the he believed were inconsistent with the medical opinions." Pl.'s Br. Summ. J. 9. This argument is unavailing. "[A] point-by-point articulation of each inconsistency is not required for the court to understand the ALJ's reasons for weight given the opinion." Hawley v. Colvin, 5:12-CV-260-FL, 2013 WL 6184954, at *4 (E.D.N.C. Nov. 25, 2013). Regardless, the ALJ's decision provides a thorough recitation of the medical record, including the notes of Drs. Keilman and Shvygin showing the largely benign physical examinations that undercut their opinions of functionality. While certainly the ALJ

16

could have provided a more detailed articulation of his reasons for discrediting these opinions, the concise analysis contained in the written decision is sufficient for judicial review, and is supported by substantial evidence. Accordingly, I must affirm the ALJ's decision on this ground.

## Credibility

Thompson argues that the ALJ improperly evaluated his credibility by applying the wrong legal standard and relied on insufficient reasons in finding Thompson's testimony not credible. The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they are inconsistent with the [RFC]" R. 20. In support of this conclusion, the ALJ cited Thompson's inconsistent statements regarding how his last job ended, his receipt of unemployment benefits, poor work history, criminal record, and failure to sign a controlled substance agreement. Moreover, the ALJ noted the lack of evidentiary support for his allegations in the medical record. I find that substantial evidence supports the ALJ's analysis of Thompson's credibility.

The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Thompson's subjective complaints of disabling symptoms are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Thompson has met his burden of proving that he suffers from underlying impairments which is reasonably expected to produce his claimed symptoms alleged. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). This assessment requires the ALJ to evaluate the intensity and persistence of Thompson's claimed symptoms and the affect those disabling conditions have on

17

Thompson's ability to work. Id. at 594–95. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

Thompson objects to the boilerplate language used by the ALJ, citing Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012), in which the Seventh Circuit criticized similar language stating:

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above"— above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

Bjornson, 671 F.3d at 645. Recent cases from districts in the Fourth Circuit have recognized that the use of such boilerplate language is acceptable "where the ALJ explains his conclusions adequately." Jones v. Colvin, 5:12-CV-00567-FL, 2013 WL 5460197, at *15 (E.D.N.C. Sept. 30, 2013); see also Mascio v. Colvin, No. 2:11–CV–65–FL, 2013 WL 3321577, at *3 (E.D.N.C. July 1, 2013). "Inclusion of what was in effect credibility boilerplate in an otherwise valid decision does not render the decision in [a]… case fatally defective." Martin v. Colvin, 5:12CV00066, 2013 WL 4451230, at *7 (W.D. Va. Aug. 16, 2013).

In the instant case, the ALJ provided a more than adequate explanation for his conclusion that Thompson was not credible, and his decision is supported by substantial evidence. Objective

18

medical evidence fails to support Thompson's subjective complaints, and the record is riddled with inconsistent statements, a handful of which are enumerated by the ALJ in the decision. The medical records demonstrate that physical examinations of Thompson yielded generally benign findings despite Thompson's complaints of debilitating symptoms, and Thompson's course of treatment was largely conservative.

Adding to the lack of objective medical evidence of disabling impairments are statements and testimony by Thompson that fundamentally call into question the credibility of his claim. When applying for disability, Thompson stated that he became disabled on August 28, 2009, when his construction company laid off its entire staff. R. 37, 216. At the administrative hearing, Thompson admitted that the business "slowed down, but they never called me back to work because they said I couldn't perform my job duties." R. 38. That Thompson's alleged onset date coincides with a mass lay-off of workers, as well as Thompson's subsequent inconsistent testimony, was a reasonable starting point for the ALJ's skepticism of Thompson's allegations.

While Thompson takes issue with the ALJ's reliance on Thompson's receipt of unemployment benefits, his argument misses the mark. The ALJ did not discredit Thompson simply because he did not look for work while receiving unemployment benefits. Instead, the ALJ was concerned with Thompson's inconsistent statements regarding whether he was in fact looking for work during the period. For example, Thompson openly admitted lying to Dr. Keilman when he stated he was looking for work in December 2009. R. 38–39, 295. Thompson also testified that he even returned to work briefly after his alleged onset date. R. 41. At an office visit in August 2010, Thompson reported that he "*is* employed as a laborer and has had increasing difficulty working" because of hand and joint pain. R. 684 (emphasis added). In any event, these statements regarding any job search during receipt of unemployment benefits was

19

but one of many reasons upon which the ALJ relied in concluding that Thompson was not credible. The ALJ was entitled to consider Thompson's criminal history, poor work history, and failure to sign a controlled substance agreement as well. See, e.g., Phares v. Comm'r of Soc. Sec., CIV.A.3:07CV90, 2008 WL 2026097, at *12–13 (N.D. W. Va. May 9 2008) (poor work history may be probative of credibility); Sessoms v. Colvin, 2:12-CV-62-FL, 2013 WL 6190967, at *11 (E.D.N.C. Nov. 26, 2013) (evidence of criminal history and substance abuse are factors that may cast doubt on a claimant's credibility). As substantial evidence supports his decision, I decline to disturb the ALJ's credibility determination.

## Obesity

Thompson argues that the ALJ failed to properly consider the impact of his obesity upon his residual functional capacity. Specifically, Thompson alleges that obesity can aggravate arthritis and diabetes and that the ALJ's failure to analyze his obesity pursuant to Social Security Ruling ("SSR") 02-1p was error. I disagree and find that remand is not proper on this ground.

The regulations require the ALJ to consider the combined effects of obesity with other impairments and to consider the effects of obesity at steps two through five of the sequential disability evaluation. SSR 02-1p, 2000 WL 628049; Greenway v. Astrue, 6:12cv00005, 2013 WL 4929931 at *6–*7 (W.D. Va. Sept. 13, 2013). There is no requirement in the regulations that the ALJ include a lengthy or precise analysis in the opinion. Richards v. Astrue, 6:11CV00017, 2012 WL 5465499, at *6 (W.D. Va. July 5, 2012) (internal citations omitted). Rather, courts have found that the ALJ may rely upon medical records which adequately show a claimant's obesity and adopt the conclusions of doctors who are aware of the claimant's obesity. Id. See also Martin v. Barnhart, 5:10CV00102, 2012 WL 663168, at *5 (W.D. Va. Feb. 29, 2012) report and recommendation adopted sub nom. Martin v. Astrue, 5:10CV00102, 2012 WL

994903 (W.D. Va. Mar. 23, 2012) (rejecting the claim that the ALJ failed to properly consider obesity where the ALJ discussed the claimant's testimony and took note of the medical opinions of record regarding her weight).

Furthermore, to challenge an ALJ's obesity analysis, the claimant must advance additional, obesity–related functional limitations not accounted for by the ALJ in his determination of the claimant's RFC. Matthews v. Astrue, 4:08CV00015, 2009 WL 497676, at *4 n.4 (W.D. Va. Feb. 27, 2009); see also Phelps v. Astrue, 7:09CV0210, 2010 WL 3632730, at *7 (W.D. Va. Sept. 9, 2010). That is, Thompson must provide medical evidence establishing functional limitations caused by her obesity that are not addressed in the RFC. Richards, 2012 WL 5465499, at *13.  See also Barr v. Astrue, 510cv00074, 2011 WL 3420844, at *6 (W.D. Va. Aug. 4, 2011) (finding that the plaintiff's high BMI did not obligate the ALJ to include a more detailed analysis in the RFC determination).

In this case, the ALJ adequately considered and accounted for Thompson's obesity. The ALJ found that Thompson's obesity was a severe impairment. R. 16. The ALJ also explicitly stated that he had considered the obesity policies of SSR 02-1p in finding that Thompson did not meet or medically equal any listed impairment. R. 17. Thompson's height and weight was well documented in the medical record from the relevant period, especially surrounding his physicians' attempts to have him better manage his diabetes. The ALJ reviewed these records and relied upon them in developing the RFC, incorporating all limitations supported therein. Moreover, Thompson does not identify any additional, obesity-related functional limitations that were not addressed by the ALJ's RFC. Thompson instead asks this Court to speculate, without evidentiary support, that he may need bariatric surgery and that his obesity aggravates his arthritis and diabetes. I find that the ALJ satisfied his duty to consider the cumulative effect of

21

Thompson's obesity along with his other impairments in finding that Thompson was not disabled.

## <u>CONCLUSION</u>

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: July 31, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge